**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-565 (CJN)** |
| **ULIYAHU HAYAH,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Uliyahu Hayah to 33 months of imprisonment, three years of supervised release, $2000 in restitution, and a $100 special assessment. The government's recommendation is at the top of Hayah's Sentencing Guidelines range of 27 to 33 months.

## I.    INTRODUCTION

The defendant, Uliyahu Hayah, a barber from Silver Spring, Maryland, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

On January 6, 2021, Hayah came to Washington, D.C. believing that the Capitol building had already been "overrun." He wanted to be at the Capitol to see change - to see lawmakers "arrested" and to disrupt the certification of the results of the 2020 presidential election. He came prepared for conflict, bringing with him a large military duffel bag that stored a gas mask, provisions, a sleeping bag and various other "supplies." Over the course of two hours, Hayah was continuously at the front lines as rioters pushed against beleaguered police officers. He was among the first rioters to make their way up the Northwest Staircase, and he entered the U.S. Capitol building within roughly a minute of its first breach. Hayah later overran a police line in the Crypt. He was near the House Chamber as rioters broke out glass panes and tried to force their way into areas where lawmakers and their staff were still evacuating. Hayah was in proximity to one rioter as she was shot trying to climb through the broken glass pane by the House Chamber. For nearly three minutes, Hayah ignored the frantic pleas of police to clear the area so that the woman could be evacuated.

When Hayah finally left that area, he was in a state of visible rage, yelling at police and shaking off their commands that he leave immediately. On his way out of the Upper House Doors, Hayah put his hands on MPD Officer R.D. and shoved him back several feet.

Once he was removed from the Capitol building by force, Hayah continued to rage against the police and lawmakers, telling a reporter that he came to the Capitol *"to see people arrested. I came here to see the final word. No more talk. No more talk."*

The government recommends that the Court sentence Hayah to 33 months of incarceration for his conviction of violating 18 U.S.C. 111(a)—a recommendation at the top of the applicable Guidelines range. A 33-month sentence reflects the gravity of Hayah's conduct, including his presence at numerous front lines as the Capitol building was under siege, the rage that he directed

towards Officer R.D., who was simply trying to do his dangerous job and protect the Capitol building, and Hayah's intent to disrupt the peaceful transition of power.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 43, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### Uliyahu Hayah's Role in the January 6, 2021 Attack on the Capitol

#### *Hayah's Breach of the Capitol Grounds and Building*

In the early morning on January 6, 2021, Hayah took a train from Baltimore to Washington, D.C. to join the protests scheduled in Washington, D.C. ECF 43 ⁋ 8. Hayah wore a black head covering, a gray sweatshirt, and dark pants. He arrived in D.C. ready for conflict, bringing a large green military duffel bag containing a gas mask, a sleeping bag, and other supplies. He also carried an American flag on a pole.

After arriving at Union Station, Hayah joined lawful protests in D.C. Later in the afternoon, however, Hayah moved with the crowd into the restricted Capitol grounds, where he joined rioters on the West Front of the Capitol building. Hayah was on the West Front as the mob swelled in numbers and overwhelmed police officers struggled to repel them. Hayah could see police use chemical irritants and deploy non-lethal ordinance to force the rioters back. The chemical irritants were so thick in the air that Hayah put on his gasmask. Eager to press forward, Hayah moved towards the scaffolding by the Northwest Staircase.



*Image 1: Hayah approached the scaffolding by the Northwest Staircase while wearing his gas mask.*

Undeterred by the police presence and numerous warning signs that he was not permitted on the Capitol grounds, Hayah was near the front of the mob as rioters overran the Northwest Staircase at 2:09 p.m. Less than five seconds after rioters forced their way past police guarding that staircase, Hayah ran up the staircase in quick pursuit; he only stopped running when he dropped his flag and bent over to pick it up.



*Image 2: Hayah ran up the NW Staircase only seconds after rioters first breached the police line [See Sent. Exh. 1].*

Once on the Upper West Terrace, Hayah moved in the direction of the Senate Wing Doors. He entered through those doors at 2:14 p.m., roughly a minute after the doors were first breached, When Hayah entered the Capitol building, he still wore his gas mask. Walking through this door, he would have been able to see the shattered glass on either side of the door and the windows surrounding it, and he would have heard the blaring alarm. None of this deterred Hayah from advancing into the building.



*Image 3: Hayah entered the Capitol building just a minute after it was first breached, and wore his gas mask as he entered.*

Hayah followed other rioters in the direction of the Crypt, and when he arrived there, it was still relatively empty. He remained in the Crypt for roughly ten minutes as it filled with rioters, and he was among the mob as it became increasingly aggressive towards police officers attempting to hold the police line. He joined the mob as it used its weight and numbers to push past beleaguered police lines at 2:25 p.m. CCTV (Sent. Exh. 2) shows Hayah and other rioters – with Hayah at the front - menacingly advancing towards police officers and forcing the officers to retreat as the crowd began to press forward.



*Image 4: Hayah was part of the mob that pushed its way past police lines in the Crypt.*
*[Sent. Exh. 2]*

Hayah made his way up a flight of stairs and by 2:30 p.m. he walked through the

Statuary Hall in the direction of the House Chamber. Hayah was at the Main House Chamber Door

as rioters chanted and berated police officers guarding the House Chamber.



*Image 5: Hayah walked in the direction of the House Chamber.*



*Image 6: Hayah gathered with other rioters in front of the Main House Chamber Door.*

Unable to get access to the House Chamber at that location, Hayah moved with the mob towards another set of doors by the Speaker's Lobby Doors. When Hayah arrived near those doors, three U.S. Capitol Police (USCP) officers were standing guard with furniture piled behind them to provide a barricade. Other officers standing on the other side the Speaker's Lobby were attempting to evacuate congressional members and staffers from the House chambers.

Hayah was present at the Speaker's Lobby Doors when rioter Ashli Babbitt was shot by a USCP officer at 2:44 p.m. He remained in the immediate area for nearly three minutes – just feet away from Babbitt's body as police pleaded with rioters to "clear a hole" and move back.[2]  Hayah looked on as police tried to provide medical assistance to Babbitt.

---

[2] See https://www.youtube.com/watch?v=L5EfNYprOuo at timestamp 39:12- 42:00. Hayah is filmed close to Ashli Babbitt after she was shot, ignoring police commands to leave for nearly three minutes.



*Image 7: Hayah by the Speaker Lobby Doors soon after the shooting of Ashli Babbitt*

Hayah began his slow exit from the Capitol building, but he did not leave easily. During his encounters with police officers, Hayah was defiant and belligerent. At 2:55 p.m., the body worn camera of MPD officer J.S. captured the officer gently nudging Hayah towards the exit by the Upper House Doors. Hayah turned and stated defiantly "Don't touch me!"



*Image 8: The BWC of MPD Officer J.S. showed that Hayah was defiant as police tried to funnel rioters towards the exit. [Sent. Exh. 3]*

At 2:56 p.m., as MPD officers attempted to remove rioters who were standing near the Upper House Doors, one rioter resisted and confronted police officers. A physical confrontation

ensued as numerous rioters pushed back and away from the exit. Hayah, who had been in the process of leaving, turned away from the door and placed his hands on MPD officer R.D. shoulder, and with what appears to be considerable force, shoved the officer back several feet.



*Image 9: Hayah turned away from the exit to push MPD Officer R.D.*



*Exh. 10 [Sent. Exh. 4] An open-source video shows Hayah pushing MPD Officer R.D. with considerable force.*

After pushing Officer R.D., Hayah was so agitated that an MPD officer had to forcibly remove him from the building at 2:57 p.m. For several seconds Hayah remained at the door's precipice, yelling and gesticulating towards the officers.



*Image 11: Hayah was personally pushed out of the Capitol building by an MPD officer.*

Hayah had been inside the U.S. Capitol building for a long time on January 6 - nearly 45 minutes. Once outside the building, Hayah spoke in a highly agitated manner about the shooting of Ashli Babbitt and he raged against the police, stating *"We didn't have any weapons. And they shot that woman. They're going to pay for this!"*[3]

---

[3]    Video    available    at    https://www.youtube.com/watch?v=XE3Op_eyvss&rco=1, Timestamp: 15:50.



*Image 12: Hayah was filmed soon after he left the Capitol building, yelling about police and promising that "they're going to pay for this."*

### *Hayah's Statements to an Epoch Times Reporter*

After exiting the Capitol, Hayah made statements to a group of people, including a reporter from the Epoch Times newspaper. In the video, which was later posted to YouTube, Hayah stated, *"if we give up, it's over for us. Every futuristic movie that they show, some dystopia whatever like that, it's going to come true, if we allow this to happen. This has got be a daily thing. This is a lifestyle – freedom ... I came here today because my freedom is at stake. I'm a business owner ... I want them to recognize what's going on ... I want all the criminals to be arrested. There's more than enough evidence. There's more than enough evidence I came here to see people arrested.  I came here to see the final word. No more talk. No more talk."*

Speaking about what he'd seen inside the Capitol building, Hayah stated, *"We pushed all the way through. They could not stop us. And I will say that some of the officers in there are decent officers. They did not want a physical confrontation. But there are some officers in there that are*

*evil. You could see it in them. They were agitating us. They were hating us. They shot a woman. From another side of the glass. We hadn't even breached that area yet. The gunshot came through. We thought it was a smoke grenade. Hit her right in the neck. She dropped right in front of us. As soon as the officers saw it, they got around us so we couldn't film. That's plenty of people that got film. Plenty of people that have film on that."*

Hayah admitted to wearing a gas mask, and stated that police had "*Maced everything. But I had a gas mask on. So they tried to get me but it was too much."*



*Image 13: Hayah made statements to a reporter and onlookers. [Sent. Exh. 5 & 6]*

*Hayah's First FBI Interview*

Hayah agreed to be interviewed by the FBI shortly after his arrest on August 26, 2021. Hayah admitted to going to protests in D.C. He admitted to carrying a gas mask, flares, and provisions, which he explained he kept with him in case he became stranded. He described the scene on Capitol grounds as "wild", and stated he not only heard explosive ordinances being thrown into the crowd, but recalled one ordinance exploding in his face and temporarily impairing his hearing and vision. He recalled individuals using poles to knock out windows – and implied that outside agitators (Antifa or others dressed like police officers) handed out objects that could be used as weapons. Hayah stated that he was praying and reading the Bible with others when he heard the gunshot that killed Ashli Babbitt, but he did not see her get shot. Hayah characterized

January 6 as an instigation by outside agitators.

*Hayah's Post-Plea Interview*

On September 12, 2024, Hayah agreed to be interviewed as a condition of his plea agreement. He recounted that he heard a news report on NPR that the Capitol building had been overrun and decided to go to D.C. Hayah stated that he took a large duffel back with him to D.C., and packed various items, including a sleeping bag and a gas mask.

Hayah recounted that he studied history in school and he approached the Capitol building hoping to film and capture "history in the making." Once on Capitol grounds, Hayah observed explosive ordinances being deployed by police officers and put on his gas mask. Hayah stated that the situation became increasingly tense and chaotic and he observed individuals engaged in conduct that he knew was not right, such as one individual using a pipe to break windows. Hayah stated that his "ignorance" and "curiosity" in the events prevented him from turning back.

Hayah witnessed Ashli Babbitt bleed to death inside the Capitol building and stated that he was upset by what he'd witnessed. He had no memory of an interview with a reporter from The Epoch Times, but stated that when he watched the interview, it did not sound like himself. Hayah spoke with emotion to the FBI during his interview and appeared to be genuinely remorseful about his actions.

## III.    THE CHARGES AND PLEA AGREEMENT

On September 21, 2021, a federal grand jury returned an indictment charging Hayah with nine counts, including violations of 18 U.S.C. § 231(a)(3) (Count One); 18 U.S.C. § 1512(c)(2) (Count Two); and 18 U.S.C. § 111(a)(1) (Count Three). On January 26, 2022, a federal grand jury returned a superseding indictment on the same counts. On August 8, 2022, defense counsel filed a motion to dismiss Count Two, which this Court granted in an order dated August 18, 2022. The

government appealed that decision, and this case was held in abeyance until the Supreme Court decided *Fischer v. United States*, 144 S. Ct. 2176 (2024), and the U.S. Court of Appeals later issued its mandate that the case be directed back to the district court. ECF 44. After careful consideration, and as a term of the plea agreement, the government agreed to ask this court to dismiss the 18 U.S.C. § 1512(c)(2) count and other remaining counts at sentencing. On August 14, 2024, Hayah pleaded guilty to 18 U.S.C. § 111(a)(1) (Count Three) of the Superseding Indictment.

## IV.    STATUTORY PENALTIES

Hayah now faces sentencing on one count of violating 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Hayah faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 or twice the pecuniary gain of loss of the offense, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Probation Office agreed with the Guidelines calculation contained in the Plea Agreement:

Count Two: 18 U.S.C. § 111(a)(1)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.1 | Official Victim | | +6 |
| | | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | -3 |
| **Total Adjusted Offense Level:** | | | **17** |

*See* Plea Agreement ¶¶ 5(A); PSR ⊦ 40.

The U.S. Probation Office calculated Hayah's criminal history as category II, which was anticipated by the Plea Agreement. PSR ¶ 49; Plea Agreement ¶ 5(B). Because Hayah has criminal history points, he is not eligible for a zero-point offender adjustment pursuant to U.S.S.G. § 4C1.1(a)(1). Hayah is also disqualified from the benefit of U.S.S.G. § 4C1.1 because he assaulted Officer R.D. U.S.S.G. § 4C1.1(a)(3).

Accordingly, Hayah's advisory Guidelines range is 27 months to 33 months imprisonment.

Because Hayah's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government must contextualize the crime. Moreover, the following information and argument make it clear that – while the government is not advocating for an upward variance or departure – the high end of the guidelines is not only reasonable, but fully balances Hayah's conduct and the circumstances in which he committed the charged assault. One cannot divorce the gravity of the overall threat to democracy from Hayah's assaultive behavior.

Indeed, as it stands now, nothing in Hayah's guidelines calculation reflects the fact that he was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.[4] There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. Thus, a sentence at the high end of Hayah's

---

[4] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 603 U.S. 480 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 603 U.S. at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

range properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53

months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the

severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Here, notwithstanding the gravity of Hayah's assault on a police officer during a riot that threatened the peaceful transfer of Presidential power, the government believes that a sentence at the top of the stipulated Guidelines range would be sufficient but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a)..

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the § 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Hayah's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

The nature and circumstances of Hayah's offense were of the utmost seriousness and fully support the government's recommended sentence of 33 months' imprisonment.

### B.  Hayah's History and Characteristics

The PSR reflects that Hayah grew up in a military household that was generally supportive, though Hayah does allege abuse by others in his community in his later teen years that caused him

to leave home at age 17.

Hayah's criminal history reflects an inability to abide by the law. His adult convictions include the following:

- 2004: disorderly conduct (guilty in absentia)
- 2004: public intoxication; paid fines
- 2005: reckless driving; paid fines and costs
- 2005: contempt of court; fine imposed
- 2006: no operator's license
- 2006: reckless driving (guilty in absentia)

In February 2018, Hayah, then 41-years-old, was charged with multiple offenses for his conduct during a road rage incident in Maryland. According to news reports, the victim was driving on United States Interstate Highway 95 when Hayah, driving another car, pointed a handgun at her. When police made an investigatory stop, they found Hayah in his vehicle sitting on his handgun. Two rifles, including an automatic rifle, were also inside the vehicle.[5] Hayah was charged in state court and convicted on one count of second-degree assault and one count of handgun transport on a roadway. He was sentenced to five years of incarceration but all but 147 days were suspended. Notably, Hayah's period of probation was terminated unsatisfactorily.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Hayah's criminal conduct on January 6 was the epitome of disrespect for the law.

---

[5]     See   https://www.wmar2news.com/news/local-news/man-arrested-after-reportedly-pointing-gun-at-woman-during-road-rage-incident

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Hayah saw numerous warning signs that he was not permitted to be on Capitol grounds on January 6. He admitted that an ordinance exploded near him, causing temporary impairment to his hearing and/or vision. He not only ignored the many warning signs, but repeatedly positioned himself at the front lines as rioters overwhelmed and pushed past police.

Hayah saw horrible violence inside the Capitol building, including one rioter bleed to death by the House Chamber Door. Instead of leaving voluntarily and recognizing rioters' role in instigating the violence, Hayah lashed out against police officers. He ignored requests that he leave the Capitol, and aggressively pushed a police officer several feet as that officer tried to do his job. And once Hayah left the Capitol, he blamed police for the violence that had taken place and repeatedly threatened retribution.

Hayah has a history of being unable to contain his rage—this was demonstrated clearly by his 2018 arrest during a road rage incident and was again on display on January 6. The same person

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

who threatened a woman with a gun on a major highway was unable to control his physical rage when he pushed a police officer with considerable force as that officer tried to remove rioters from the Capitol.

In his most recent interview with the FBI, Hayah expressed remorse for his actions, and those expressions of remorse seemed sincere. Nonetheless, given Hayah's willingness to engage in a violent riot despite the many warning signs, and his history of threats of physical violence, a significant sentence is necessary to deter Hayah from engaging in future violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s]

and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the § 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Court should consider the case of *United States v. Matthew Brackley*, 24-cr-9 (CJN), another January 6 defendant who pleaded guilty to one count of violating 18 U.S.C. § 111(a)(1) Like Hayah, Brackley was present on the Capitol's West Front, where he ignored numerous warning signs that he should leave, including tear gas grenades and police presence. Both defendants entered the Capitol through the Senate Wing Doors, though Hayah was among the first rioters up the Northwest Staircase and entered the Capitol immediately after its breach. Brackley, by contrast, followed the mob nearly ten minutes later. Both moved past police lines in the Crypt, though Hayah was at the front of rioters pushing against police and Brackley was not. Brackley pushed a USCP officer near the Senate Chamber who tried to block rioters' passage down a hallway. Hayah, by contrast, was leaving the Capitol building when he turned around and pushed MPD Officer R.D. This Court sentenced Brackley to 15 months of incarceration followed by 24 months of supervised release. A longer sentence is warranted for Hayah, who has criminal history, used more force than Brackley in furtherance of his assault, and came to the Capitol for the purpose

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

of arresting lawmakers while they attempted to certify the electoral college votes.

The Court should also consider the case of *United States v. Nicholas Ortt*, 24-cr-224 (LLA), who like Hayah, also pleaded guilty to one count of violating 18 U.S.C. § 111(a)(1). Both Hayah and Ortt pushed against police lines. While Hayah was one of the first rioters up the Northwest Staircase and helped to force back the police line in the Crypt, Ortt pushed against police on the West Terrace. Whereas Ortt grabbed at police batons and physically struggled with a police officer on the Terrace as police tried to prevent the flow of rioters towards the Capitol, Hayah assaulted a police officer as rioters were being pushed out of the Capitol building. Both defendants made statements soon after their assaults—Ortt was active on social media and expressed pride in taking part in the riot, while Hayah gave interviews and promised retribution and revenge on police and politicians. Ortt, unlike Hayah, did not have a prior criminal history. Judge AliKhan sentenced Ortt to 27 months of incarceration followed by 36 months of supervised release.

Another case to consider is *United States v. McMahan*, 24-cr-155 (TSC). McMahan pleaded guilty to one count of violating 18 U.S.C. § 111(a)(1). Both Hayah and McMahan arrived at the Capitol prepared for violence and brought with them a gas mask and other supplies. Whereas Hayah approached from the West Front, McMahan entered the restricted area from the East Front. While on the East Front, McMahan grabbed and removed a bike rack barrier to facilitate rioters' route to the Capitol. Hayah, by contrast, facilitated rioters' movements by breaching numerous lines by the Northwest Staircase and Crypt. McMahan pushed a police officer on the east steps while trying to force his way into the Rotunda, and later made physical contact with other police officers near the Rotunda. Hayah is not captured on video making physical contact with police officers other than Officer R.D., but he repeatedly showed aggression towards police and ignored their request that he leave the Capitol. McMahan, unlike Hayah, did not have prior criminal history

points. Judge Chutkan sentenced McMahan to 19 months of incarceration followed by 12 months of supervised release.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Hayah must pay $2,000 in restitution, which reflects in part the role Hayah played in the riot on January 6.[10] Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Hayah's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 110.

## VIII.  FINE

Hayah's conviction for a violation of 18 U.S.C. § 111(a)(1) subjects him to a statutory maximum fine of $250,000. See 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. See 18 U.S.C. § 3572(a)(1); See U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the PSR notes that Hayah is unlikely to be able to pay a fine. See PSR ¶ 90.

## IX.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 33 months' imprisonment (the top of the applicable guidelines range), 3 years' supervised release, $500 in restitution, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Melanie Krebs-Pilotti*
MELANIE KREBS-PILOTTI
Trial Attorney- Antitrust Division
Cal Bar 241484
601 D Street NW
Washington, DC 20530
Melanie.krebs-pilotti2@usdoj.gov
(202) 870-7459